416-0880, People of the State of Illinois v. Brandon Collier. For the appellant, we have Ms. Punjabi. Is that the correct pronunciation, ma'am? Okay, thank you. And for the appellee, Mr. Manchin. You may proceed, counsel. May it please the court, I represent the appellant's matter. Mr. Collier appeals his conviction for first degree murder and argues that the state's evidence was insufficient where his conviction was based pretty exclusively on two very problematic eyewitness identifications, naming him as the shooter in this case. Now, appellant acknowledges that the applicable standard of review here, pursuant to Jackson v. Virginia, views the factual record in a light favorable to the prosecution and differs to the fact finder's determination, but the standard of review does not immunize the prior fact's determination from appellant reviews together. This court can and should incentivize a conviction if the evidence is still unreasonable or unsatisfactory as to create a reasonable doubt or as to fail to create an abiding conviction of the defendant's guilt. Appellant submits that this is one of those rare cases where the credibility concerns with respect to the two primary eyewitnesses, Dr. Yonah Fonville and Sharnice Caraway, the credibility problems with those witnesses were so deep and severe that this court should reverse the prior fact's determination to accept one of their identifications. With respect to Yonah Fonville, she testified at trial that she did not see Mr. Collier as being present when the shooting occurred, and the state then admitted for acceptance a prior recorded interview taken from her by the detective in which she identified Mr. Collier as the shooter. However, the circumstances under which her prior statement was taken were both too coercive and too suggestive to render the statement worthy of any significant evidentiary value. With respect to the coercive influences on her statement, Dashiana explained at trial that she did not actually see Mr. Collier commit the shooting, and the reason she inculcated him in her prior statement to the detectives is because the detective told her she was under arrest. If she did not tell them what they wanted to hear, she would be charged with murder, with a gun case, other offenses. Her brother would go to prison. Her 13-year-old sister, of whom she had guardianship, would be taken away. And you can hear reference to some of those threats. Well, counsel, you mentioned reference to some of those threats. Were all of those threats actually captured in the interview that was shown to the jury? Certainly you can hear the detective talking about, well, you're going to, you know, if you don't tell us what we want or you don't cooperate with us, you know, this could fall on you because you're, it was a misstatement of the law of accountability. Basically, this was a misstatement of the law of accountability. So you could take a fall for this. And there was some reference to, you know, you've got to clear this up because, you know, Travoy was there and he could get in trouble for this, and he could take a fall. And so you can hear some reference, albeit in more veiled fashion, in the recorded interview itself. I think there is some reference to her having guardianship over her sister as well. Now, was the interview shown over objection? I don't believe there was an objection. I guess what I'm wondering is, you have this interview and what was said, and that was shown to the jury, and then you have her trial testimony, and as you reference the burden here, how we are to view the evidence in the light most favorable to the state, given the versions, where does that leave us? Well, I think, I understand, again, I acknowledge the standard of review. I think the more troubling portion of her statement is the clear, suggestive influences. It's clear from, when you look at the progression of Dashiona's statement to Detective Davis, that he is supplying information to her, and you can hear this in the statement itself. First she tells him, Detective Davis, maybe Little Mo was the shooter, maybe Brandon Collier was, she did not really know. And the detective explicitly instructs her to subtract Little Mo out of the equation, focus on inculcating Brandon Collier, and on his own suggests to her, Mr. Collier then ran into the house with a pistol after the shooting, and to which she replies, I did not see that. And it's only hours later that she starts to agree with the officer's suggestion and states that that's what she saw, and then she continually insists that she did not see Brandon Collier with a gun, and the detective keeps asking her, what else could she give him until she finally asks if cleaning a gun would solve the case, and then he says, yes, that's going to be very helpful. And at that point she tentatively starts to say, well, I saw something that could have been a gun or a phone, and we would further talk about how she agrees with the gun. And so, you know, it's clear that she is under tremendous coercive pressure, and then she merely reshapes and reshapes and reshapes her statement through the course of the interrogation until it concords with what the police think they know about how this event happened. And Detective Davis admitted at trial that Dashiell May had expressed reluctance about testifying and that he seized on that, and that he dangled the carrot of not having to testify if she inculcated Mr. Collier strongly enough. He was pretty direct about this with her, and he also stated the risk of getting charged with murder if she did not. And he admitted this possibly could lead her to give a false statement, and she testifies ultimately that is what happened. So, you know, under these circumstances, this is not a prior statement to which any reasonable prior fact can give any credence. And if I may move on to Sharni's Carraway statement, because it suffered from some of the similarly suggestive problems. You know, to the extent that she stated to Detective Davis that she was able to see the figure of the shooter and his body type due to the muzzle flash of the gunshot, it's clear she was regurgitating information that Detective Davis himself supplied to her. When she first talked about what happened, she did not mention seeing a flash of light or gunfire, and she was unable to say that she could see the body type of the shooter. And Detective Davis then admitted that he did tell her several times, since it was nighttime, there must have been a flash of light, there must have been a muzzle flash with the gunfire, and it was only a couple of hours later that she started to say that she saw that flash which allowed her to see the shooter's body shape. So it was only after Detective Davis introduced the idea that the muzzle flash would have allowed her to see the shooter, and only after he repeatedly suggested it for a couple of hours that she relented and she described the muzzle flash with highly improbable, you know, she said she lit up a whole red sky briefly. And of course her prior statements to the authorities were significantly at odds with her trial testimony. At trial she testified that she was able to see that Brandon Collier committed the shooting. This was entirely inconsistent with several prior statements she made. She admitted, at trial she admitted she didn't tell the officers hours after the offense when she spoke to someone at the hospital that she knew who the shooter was or who it was. And it's not because she was, granted she was at the hospital, she had just been in a car accident, but it's not that she was so incapacitated that she could not provide a detailed description at the time. She did provide a detailed description, it just, she left out the important things. If indeed she had seen Brandon Collier commit the shooting, she didn't mention it at that time. And if it's someone she knew, presumably she would have mentioned him by name, if that's what she saw. And of course, a little over a week later, she told Detective Davis she did not see the shooter's face. And even up to one week prior to the trial, she was still telling the authorities that she had not seen the face of the shooter. And Detective Davis' testimony also discredited Charnese's trial testimony in another way, where he testified that when they met about a week after the shooting, Charnese told him she did not realize that Mr. Collier was the shooter until Little Mo mentioned it in a subsequent conversation with her days later, that the bullets Brandon shot had been meant for him. So contrary to her trial testimony, her statement to Detective Davis one week after the shooting indicated that at the time of the shooting she had not discerned that Mr. Collier was the shooter, and it was only days later that someone else planted this idea in her mind. So overall, Charnese's trial testimony was significantly impeached by her prior statements. Her prior statements themselves were contradictory, improbable, appear to be shaped on something that can point by the suggestions made to her by Detective Davis. And under these facts, no rational trier of fact could have accepted her testimony as true. And the trial court seemed to admit as much on the ruling for the motion, the defense's motion for directed verdict. Obviously, there's a jury and a trier of fact here, but it's worth noting that the trial court, when defense counsel pointed out all these problems in Charnese's testimony and said, this testimony was so deeply impeached that no rational trier of fact could possibly accept it, the trial court said, yes, counsel, I think your assessment of the credibility of this witness is correct. And, you know, where you don't have anything else here, there's no physical evidence tying Mr. Collier to the shooting. There's no statement from him. There's nothing else. You just have these two deeply flawed identifications. I submit that the state simply fell short of its burden. If there were no other questions on this issue, Mr. Collier argued alternatively that should this court not have, in light of Jamona Collier's eyewitness testimony, identified someone else as the shooter, which was discovered after the conclusion of trial and likely could have changed the results of her retrial. Now, in Illinois, as this court is well aware, this type of claim warrants a new trial where the evidence is newly discovered, material, and not cumulative and has such conclusive character that it would probably change the results of retrial. And, again, here where the state's evidence was so weak, and, you know, you have a conviction based on a recanted prior inconsistent statement that was extracted through coercive and suggestive procedure. And, of course, with respect to Sharnese Carraway, I just talked about problems with her testimony and her statement, you know, and where you don't have anything else, the state's case was so paper thin that had the jury heard from another witness whose testimony tended to exonerate Mr. Carraway, the verdict very well could have gone the other way. And it's important to remember that our Supreme Court has clarified that new evidence need not definitively establish the defendant's innocence. Instead, a new trial is warranted if, in light of the new evidence, the facts and circumstances should be scrutinized more closely to determine the defendant's alternative innocence. And, again, where the evidence is so weak to begin with, I think that that standard certainly is not here. What about the dispute regarding whether or not this was actually newly discovered evidence, whether or not it was not in the trial? Yes. So, Jimona Pollier testified a little bit about this at the post-trial evidence hearing. She said that there was some ambiguity in her testimony. She stated that when she spoke to the trial attorney prior to trial, she only told him a little bit about what happened. When she eventually told him about seeing Mr. Bonner commit the shooting, it's unclear from her testimony at the hearing that she told him this prior to or subsequent to the trial. But the trial attorney clarified this. He testified at the post-trial hearing that the first he heard about this was subsequent to the conclusion of the trial. And so that would establish that this evidence was newly discovered. And it's not that the attorney didn't do his due diligence prior to the trial. He did interview her, but he could not force her to reveal what she saw until she was prepared to come forward. She testified that she was intimidated by Montrez Bonner and his brothers, I think she said. This was a young girl, and one can see how she would be intimidated by the circumstances. And so she explained why she did not come forward to debate her. Unless there were any other questions for this court, for the reasons argued here and in his briefs, Mr. Collier asked that this court reverse his conviction outright or alternatively remand him to the trial. Thank you, counsel. Mr. Manchin. Good afternoon, your honors. This is the court and counsel. In this case, the alleged problems and the witnesses at stake were raised by the defendant below. You can substitute the defendant's argument in his brief. And here today is the defendant's closing argument in the trial. It would be absolutely null and void. The defendant is simply asking this court to act as a retrial defendant and to substitute in general for the jury. The jury could accept the testimony of, sure, the witnesses said, I saw the defendant firing the shots in the light of the house light and the flashes of the thing. The differences in her prior statement is explained by the fact that she was the defendant's friend and was hesitant to speak, was afraid of the defendant, was badly injured at the time she was interviewed by the police. The details that she gives are beyond what anything that was shown in this suggested to by the police. So there was a basis for the jury to accept her testimony despite the impeachment. With regard to Fonville, she never recanted the prior statement. She never disavowed it. She never said it was false. All she said, I don't remember, I don't remember, I don't remember, when asked about the statement. I kind of over 100 times what she said, I don't remember. Well, counsel, do you agree with the trial court's assessment that the interview was pretty coercive and that she was not a very credible witness? I don't believe it was coercive. I think that it was, the police were faced with this witness who was making statements showing that she knew something, but said, I don't want to listen to this, I don't want to tell, I'm being under pressure not to tell. They just simply did what they could to get her to flesh out what they said. A lot of the details that she provides to the police were much greater and more detailed than anything that she was told by the police during the interview. The police had to focus her, focus her on the defendant and on exactly what she was trying to say, saw, because she had a tendency to ramble all over the place, and you couldn't tell whether she was talking about what she knew or what she had been told or what she had heard, and they had to focus her on that. I don't believe that this is so coercive as to say that the Trump jury could have disregarded it. The jury was played the entire four hours of the interview. Everything that every alleged threat of coercion or saying, you know, saying, hey, you've got to clear this up, or you could face possible charges, everything's there. It's the jury of the jury. Okay, given this duress, she's nevertheless credible in her description of what happened on the night of the events, her testimony, her statement to the police was that prior to the shooting, she saw the defendant playing with his gun to a rap gun scene and pointing it around, and she saw after the shooting, and she also said on the tape that she saw the defendant with the gun at the time of the shooting. None of these details... But this was after she initially said he wasn't even at my house, right, and that she had not seen him. Well, it was also after she was saying, I'm not going to... I don't want to say anything because I'm afraid of... because I'm under pressure and I'm afraid and I don't want to be a snitch. So how much weight... It's for the jury of the jury. Okay, which weight do you give to? Do you give it to this statement that I don't know anything, or do you give it to this detailed statement about exactly what the defendant was doing? She also, in her statement, she also reports several conversations that she overheard in which the defendant was a party, discussing the gun having jammed and the cartridges or the shell casing that was found inside her house and why the hell did, to quote a paraphrase, why the heck did you leave that cartridge in my house? And she was talking to the defendant and his friend regarding the fact that the gun was jammed. None of this was provided to them by the police in any shape, way, or form. So to say that this is all information that the police fed to her and that she simply regurgitated and that it has to be disregarded because it was information provided by the police simply does not apply. Because there's so much more that she said than what she was informed of or told about the crime, how it happened, who was involved, anything like that. So I think this is a question of, under the standard, taking the evidence of the light most spared for the state, could any reasonable charge of fact find this man guilty? And I think that the evidence speaks to that standard. Getting to the question of the quote-unquote newly discovered evidence, Jamona's testimony at the hearing was unambiguous. Did you talk to anybody about this before trial? Yes. Who did you tell? Defendant's attorney. What did you tell them? Did you tell them that you saw this other guy do the shooting? Yes. That clearly shows, and the testimony was, I told him before trial. This is a young lady who was known to be a participant. She was actually subpoenaed to be a witness and was present in the court. To say that this was newly discovered evidence is just a fly in the face of her clear testimony. I told the defendant's attorney before trial that I saw somebody else do the shooting. The attorney never said that Jamona told me nothing. What his testimony was that he was not aware of this measure that she wrote after trial. He never said, I did not know about this alternative shooter from Jamona. His testimony was simply, I did not know about the letter until it was brought to my attention after the trial. But this is a witness, this is a person who is known to the defendant. The information could have been easily discovered before trial, assuming it wasn't disclosed. And she expressly testified that before trial, she told the defendant's attorney that I saw somebody else commit the shooting. At the hearing, the trial court said, I simply don't believe her. I do not find her credible. And I submit that his determination to deny the motion for a new trial was not an abuse of discretion because the evidence showed that she was not newly discovered in any shape or form. She was known before trial. Her information should have been known by the simple experience of, if you're a subpoena, simply talk to her before trial. Okay, what do you know? This is not a case like Ortiz cited in the defense brief, where there's a shooting in the park. Ten years after the defense, a witness goes forward and says he was in a different area of the park and saw the shooting. This person was not known and could not have been known at the time of the shooting. That guy also left the state for ten years immediately after the offense and did not come forward until ten years later to say what he knew. This was a person who was known to be a potential witness. Subpoena at this point was the defendant's own sister. And who testified at the hearing, I told the attorney that I saw somebody else do the shooting. The trial court's finding as to the motion for a new trial was justified and proper. Is there any other questions? I don't see any at this time. Thank you, Mr. Manchin. Ms. Punjabi, any rebuttal? I wanted to make a point. With respect to Jerome's testimony on the issue of what she told the attorney You can look at the record and decide for yourselves, but I would submit that there is some ambiguity. The attorney asks, before the defendant's trial, he told the lawyer about this, about seeing others on the shooting. She says, yeah, a little bit, but not everything. Well, when you say a little bit, what parts do you remember telling me? That I was there. Then, one or two questions later, he asks, well, did you tell them about how the respondent committed the shooting? And she says, yeah, but it's not clear whether we're still talking about prior to the trial or after the trial. But, of course, this court should look at the record and make its own determination on how to read that. And, of course, you do have the attorney, though, as an officer of the court, telling the court, I did not hear about this until subsequent to the conclusion of the trial. Now, if I could go back to Sharnice Carraway's testimony, counsel made a point that because Sharnice Carraway was Graydon Collier's friend, that that may have explained her initial reluctance to meet him. But I think that that cuts the other way, in fact. The fact that she knew who this person was shows that you would identify that person by name. You wouldn't give a vague description. You would identify someone whom you know by name. Counsel makes the point that Ms. Fonville never actually recanted. I would submit that implicitly she did. She stated that at trial that she didn't see Mr. Collier commit the shooting. Her prior statement was that she did see him commit the shooting. I would call that an implicit rejection of her prior statement, or recantation of her statement. The state asks that this court defer to the jury's determination here. Again, I acknowledge the deferential standard of review. This does not inunite the jury's determination from review altogether. I cite cases in my brief where, under factually similar circumstances, the court on review did not find the Jackson v. Virginia standard, or that the state's burden had been sustained. Courts should not hesitate where the evidence is so unreasonable that no jury could have, should have, or no rational trier of fact could have accepted it. Courts on review should not, under those circumstances, hesitate to reverse. And I think this is one of those few cases, again, where this court should, where reversal is warranted. Well, counsel, opposing counsel points out that, with respect to Ms. Fonville, there are extensive details that she provided that were not provided to her by the police. Do you agree with that assessment? I would not say that they were extensive details. There were some details that she, she, the, the major, all the major points were provided by the detective. Now, she may have filled in some of the minor details, but the major, the major structure of the narrative was provided by Detective Davis, and he prodded her and prodded her and prodded her until she agreed. He's the one who told her, you focus on me and Mr. Collier. Subtract everybody else out of the equation. He's the one who told, then told her, unprompted, he, he, Mr. Collier ran into the house after the gun, after the shooting with the gun, didn't he? And she said, I didn't see that. And he, he prods her until she finally relents and accepts that suggestion. He's the one who... And later says that the defendant was the one who explained that he didn't realize that he dropped the shell casing in the house, right? That's correct. So, because she says that... So, now she suddenly goes from not seeing him to, he didn't do the shooting, to, okay, maybe he ran into the house. But then, on her own, without, and that's something the police officers clearly couldn't know anything about. The conversation had between her, the other individual, about how come you left the shell casing in my house? This looks bad on me. And it's the defendant who's present during that conversation and pipes up and says, I didn't realize we dropped it. Well, so, I, I believe, you know, she's still trying to shape her narrative in a way. She's filling in the...  But she's, she's still shaping, she's filling in the details. Okay. He, he told, you know, the detect, at first she said, well, I overheard Mr. Collier. When, after being told to focus on inculcating Mr. Collier, she's told to, she says, she starts submitting that she overheard other people say he committed the shooting. And then she's told, no, no, that's her saying that that's not good enough. We need, we need more from you than that. Then, she's told, well, okay, then maybe I overheard him say something. But this isn't admission to the shooting. This is a totally separate, ancillary matter, which I would suggest she really wouldn't even understand the significance of. Well, I believe, I might be wrong, but I believe that the police were aware of where the shell, they had processed the case. Well, sure, they knew there was a shell case at the house. They knew, they were aware of the physical evidence. Again, I just think when you look at this as a whole, her statement was just structured by what Detective Davis supplied to her. And that just renders it questionable. All of which was argued to the jury. That's true. Would you agree with Mr. Manchin's argument, statement, that essentially everything you've argued was argued in front of the jury? I would agree with that, but I would also. We're to decide, they're wrong, and we're going to make a new factual determination. It's not a new factual determination, but it's a determination that, that the jury's factual determination was so unreasonable that it just does not create an infighting conviction. And again, I cite the cases we're reviewing in courts. I'm not hesitating under factual dissimilarities to make the same determination. And I think that's the appropriate interpretation. Thank you, counsel. Thank you. We'll take this matter under advisement and be in recess until the next case.